IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,            )
                                     )
                Plaintiff,           )
                                     )
v.                                   )
                                     )        No. 3:18-CR-25-PLR-HBG
RICKY DAVIS,                         )
                                     )
                Defendants.          )

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. After midnight on February 19, 2018, officers from the Knoxville Police Department ("KPD") stopped Defendant Ricky Davis, as he was driving his white Honda Accord a few blocks from his residence. After the officers arrested Davis for driving on a revoked license, a drug detection dog alerted on the Honda and Davis's silver Cadillac, which was parked on the street nearby. Officers searched both vehicles, finding a small marijuana cigarette in the Accord and a bag of illegal drugs in the Cadillac. The Defendant contends that officers lacked reasonable suspicion to stop the car he was driving and probable cause to search either car. The facts presented at the evidentiary hearing show otherwise.

The Court finds that the officers, who were dispatched to Davis's residence to investigate the report of a return of a stolen Honda Accord, could properly investigate the suspicious activity that ensued. The Court also finds that the officers had probable cause to search both vehicles based upon a positive alert from a trained drug detection dog. Accordingly, for the reasons discussed

herein, the undersigned recommends that the Defendant's Motion to Suppress Evidence [Doc. 27] be denied.

## I.      POSTIONS OF THE PARTIES

This case arises out of the KPD's February 19, 2018 stop and search of the Defendant's Honda Accord and the search of a Cadillac also owned by Defendant Davis. Based in part upon evidence seized from the Cadillac that day, Defendant Davis is charged [Doc. 3] with conspiring to distribute and to possess with intent to distribute methamphetamine and fentanyl from June 1, 2017, to March 6, 2018 (Count One). Davis is also charged with distributing methamphetamine and fentanyl on June 15, 2017 (Count Two). The Indictment alleges a sentencing enhancement for Counts One and Two based upon an overdose death on June 16, 2017. Defendant is also alleged to have distributed methamphetamine on July 20, 2017 (Count Three) and possessed methamphetamine with the intent to distribute on February 19, 2018 (Count Four).

Defendant Davis asks [Docs. 27 & 37] the Court to suppress all evidence seized from the search of his two cars, arguing that this evidence was gained in violation of the Fourth Amendment. First, he contends that the officers lacked either probable cause or reasonable suspicion to conduct the initial stop of his Honda Accord. Second, the Defendant challenges the constitutionality of the search of both of his vehicles, arguing that the officers did not have probable cause to search either vehicle and the warrantless search of his lawfully parked Cadillac did not fall within any exception to the warrant requirement. As a part of his attack on the searches of both vehicles, he argues that the drug detection dog employed by the officers was not reliable and did not alert on either car. Finally, Defendant Davis asserts that the cumulative effect of all of the constitutional violations in this case warrants the exclusion of the evidence seized from his vehicles.

2

The Government responds [Docs. 28 & 38] that the officers' actions comported with the Fourth Amendment. It contends that the officers had reasonable suspicion to stop the Accord, because it had been reported stolen and the driver appeared to be attempting to evade them. The Government maintains that the Defendant was lawfully detained, because the officers had reasonable suspicion that the Accord was stolen, and was lawfully arrested for driving the Honda on a revoked license. It argues that the officers lawfully searched the Accord, which remained in their custody following the Defendant's arrest, based upon probable cause from an alert by a qualified and reliable drug detection dog. The Government asserts that the officers also properly searched the Cadillac, which was parked in a public place, based upon the positive alert by a qualified and reliable drug detection dog.

This case came before the Court on November 2, 2018, for an evidentiary hearing on the Motion to Suppress Evidence. Assistant United States Attorney Tracy L. Stone appeared on behalf of the Government. Attorney Richard L. Gaines represented the Defendant, who was also present. At the conclusion of the hearing, the Court granted defense counsel's unopposed request to file post-hearing briefs in lieu of oral argument. The parties filed their post-hearing briefs [Docs. 38 & 39] on December 17, 2018. The Court then took the matter under advisement.

## II.    SUMMARY OF TESTIMONY

The Government presented the testimony of KPD Officer Alan Stonerock and Knox County Sheriff's Deputy Gerrit Graves. Officer Stonerock testified that he is a patrol officer for the KPD, where he has worked since 2011 [Tr. at 6].[1] Officer Stonerock said that approximately

---

[1] The transcript [Doc. 32] of the November 2, 2018 evidentiary hearing was filed on November 28, 2018.

3

two weeks before February 19, 2018, KPD Officer T. Campbell had attempted to conduct a traffic stop on a white Honda Accord but the vehicle fled [Tr. at 8-9, 13]. Officer Campbell reported the vehicle's license tag number and description over the radio. Officer Stonerock, who was on patrol that evening, conducted a records check on the license tag number and learned the Accord was registered to Ricky Davis, who lived at 4108 Deer Creek Drive [Tr. at 8-9, 13]. Officer Stonerock drove to 4108 Deer Creek Drive to wait for the Accord to return but did not encounter the Accord that evening [Tr. at 9-13].

Officer Stonerock testified that he was on patrol on the night of February 19, 2018, when he received a radio call from the KPD dispatcher that the owner of a stolen white Honda Accord had reported that he had recovered the car and that it was now located at his house at 4108 Deer Creek Drive [Tr. at 7, 11-12]. Because of the failed traffic stop two weeks earlier, Officer Stonewall knew this was Ricky Davis's address and that he owned a white Honda Accord, but he did not know that the Accord was previously reported stolen [Tr. at 8-10, 13]. Soon after receiving the dispatch, Officer Stonerock and Officer Campbell responded in separate patrol cars to 4108 Deer Creek Drive, the address provided by the dispatcher [Tr. at 12, 14]. Officer Stonerock testified that upon arrival, he and Officer Campbell discussed briefly that this was the address related to the Accord that had previously fled the traffic stop [Tr. at 13]. Officer Stonerock said they saw vehicles in the driveway of 4108 Deer Creek Drive but not the white Honda Accord [Tr. at 13]. He testified that at the time they arrived at the residence, their suspicions were already aroused, because it was unusual for someone to report that a stolen car was back at the owner's home [Tr. at 14].

Officer Stonerock said that Officer Campbell went to the front door, while he walked to the side of the house, near the driveway, to watch for a potential ambush [Tr. at 14]. While standing

4

there, Officer Stonerock saw a silver Cadillac, followed by a white Honda, driving on Deer Creek Drive toward the residence [Tr. at 14-15]. Officer Stonerock stated that at the point the driver of the Cadillac would have seen the patrol cars parked on Deer Creek Drive, the Cadillac made an wide and abrupt left turn onto Deer Lake Drive, and the Honda followed it [Tr. at 15]. Officer Stonerock testified that the vehicles did not brake before turning and that it appeared to him that the drivers of these vehicles did not want to interact with law enforcement [Tr. at 15]. Officer Stonerock exclaimed to Officer Campbell, "there goes the white Honda"[2] and ran to his patrol car to catch up to the Cadillac and Honda, which had moved out of his line of vision [Tr. at 16, Exh. 1, Stonerock clip 1].

Officer Stonerock testified, with the aid of his in-car video recording [Exh. 1], that as soon as he encountered the cars on Deer Lake Drive, he ran the license plate on the Cadillac, which was parallel parked on the right side of the street [Tr. at 17-18]. The records check revealed the Cadillac was registered to Ricky Davis [Tr. at 17-18]. The Honda continued down Deer Lake Drive a little beyond where the Cadillac was parked, turned around in a driveway, and drove toward Officer Stonerock [Exh. 1, Stonerock clip 1]. Officer Stonerock activated his blue lights and stopped the Honda as it drove by his patrol car [Tr. at 18]. The Defendant Ricky Davis was driving the Honda and another male, later identified as Ronnie Johnson, was in the passenger's seat [Tr. at 18, 20]. Officer Stonerock spoke to Davis, who said he was going to his mother's house [Tr. at 18, 20, Exh. 1, Stonerock clip 1]. Officer Stonerock asked Davis to whom the Cadillac belonged [Tr. at 18, Exh. 1, Stonerock clip 1]. Officer Stonerock said that Davis replied, "probably one of those guys over there" and "I've been trying to buy it" [Tr. at 19, Exh. 1, Stonerock clip 1]. Officer Stonerock

---

[2] Officer Stonerock testified that he said, "there goes a white Cadillac," [Tr. at 16], but the audio recording from his in-car camera reveals that he said, "there goes the white Honda" [Exh. 1, Stonerock clip 1].

5

directed the Davis to turn the Honda off and give him the keys [Exh. 1, Stonerock clip 1]. Davis was not able to produce identification but agreed that he was Ricky and that he was the one who had reported that the Honda was stolen [Tr. at 19, Exh. 1, Stonerock clip 1].

The video recording reveals that Officer Stonerock informed Davis that the Cadillac was registered to him, and Davis responded that he was trying to rent the Cadillac and that he had not paid for it yet [Tr. at 19, Exh. 1, Stonerock clip 1]. Officer Stonerock repeatedly directed the Davis to keep his hands in view on the top of the steering wheel [Exh. 1, Stonerock clip 1]. Officer Stonerock asked Davis to get out of the car and to keep his hands above his head [Exh. 1, Stonerock clip 1]. He then asked Davis to place his hands behind his back and handcuffed him [Tr. at 20, Exh. 1, Stonerock clip 1].

Officer Stonerock said that up to the point at which he handcuffed Davis, he knew that a white Honda that had previously fled a traffic stop was linked to 4108 Deer Creek Drive [Tr. at 22]. He knew that the same type of vehicle, a white Honda, was reported stolen then reported recovered and back at this address [Tr. at 22]. Officer Stonerock also knew that while attempting to contact the residents at 4108 Deer Creek Drive, he saw a white Honda drive toward the house, then abruptly turn onto a side street [Tr. at 22]. He also knew that Davis was driving the Honda and denied owning the Cadillac, although it was registered to him [Tr. at 22]. Finally, he had learned that Davis had a revoked driver's license [Tr. at 22].[3] Officer Stonerock said that these observations "threw up a lot of red flags" [Tr. at 23]. He also said the Defendant acted nervous and evasive while answering questions, after he was stopped [Tr. at 23]. Officer Stonerock stated

---

[3] Officer Stonerock initially testified that he did not learn that Davis had a revoked license until after he had handcuffed Davis. [Tr. at 21-22]. However, he subsequently testified on both direct and cross examination that he learned Davis had a revoked license before he handcuffed him [Tr. at 22, 57].

that, based upon his experience as a police officer, individuals are evasive either because they are hiding something or because they are avoiding attention [Tr. at 23]. Officer Stonerock said he was also suspicious about the Defendant acting like the Cadillac did not belong to him [Tr. at 24, 26]. Officer Stonerock related that he thought there were people in the Cadillac, until he realized that his partner, who had checked the Cadillac, was not interacting with anyone [Tr. at 24, 27-28].

Officer Stonerock testified that based upon the Defendant's behavior, he suspected the Cadillac contained drugs and called for a canine officer [Tr. at 24-26]. He said that once he confirmed that the Defendant had no outstanding warrants, he thought the Defendant was being evasive about the Cadillac because he was hiding something, potentially drugs [Tr. at 26, 28]. Knox County Sheriff's Deputy Gerrit Graves, the canine officer, arrived on the scene, and Officer Stonerock briefed Deputy Graves on the situation [Tr. at 28-29, Exh. 1, Stonerock clip 2]. Deputy Graves led his canine around the Cadillac [Tr. at 30; Exh. 1, Stonerock clip 3]. Deputy Graves told Officer Stonerock that the dog alerted on the passenger's side door of the Cadillac [Tr. at 31, Exh. 1, Stonerock clip 3].

Officer Stonerock stated that Deputy Graves also led his dog around the Honda [Tr. at 32, Exh. 1, Campbell clip 1]. He said that Deputy Graves told one of the officers present on the scene that the dog also alerted on the Honda [Tr. at 40]. Officer Stonerock testified that following the drug dog's alert on both cars, officers searched the Honda and found the keys to the Cadillac between the Honda's driver's seat and center console [Tr. at 32-33]. He said he was not aware that anything other than the keys to the Cadillac was seized from the Honda [Tr. at 40]. Officer Stonerock pushed the key fob on the keys found in the Honda and unlocked the Cadillac [Tr. at 33, Exh. 1, Stonerock clip 4]. He said the officers found a margarine tub containing a clear liquid in the Cadillac [Tr. at 33]. They also found a Crown Royal bag that contained different types of

7

narcotics and a handcuff key in the center console of the Cadillac [Tr. at 33, 34, Exh. 3]. Officer Stonerock said the Crown Royal bag contained the following: eighteen (18) packs of three-milligram Suboxone, twenty-three (23) individually wrapped bags of a clear crystalline substance that appeared to be methamphetamine and collectively weighed 86.4 grams, and a plastic bag containing one-hundred thirty-seven (137) two-milligram Xanax pills [Tr. at 37].

Officer Stonerock testified that he interviewed Ronnie Johnson, the passenger in the Honda, who said he had picked up the Honda earlier that day in a parking lot on Western Avenue, near a bowling alley [Tr. at 20, 41]. Johnson told Officer Stonerock that he drove the Honda to Deer Lake Drive, pulled behind the Cadillac driven by Davis, and then moved to the passenger seat of the Honda [Tr. at 41]. Officer Stonerock said Johnson told him that Davis got into the driver's seat of the Honda just before Officer Stonerock drove up behind them [Tr. at 41]. Officer Stonerock also testified that the Cadillac was warm, which indicated that it had been driven recently [Tr. at 42].

On cross-examination, Officer Stonerock stated that at 12:55 a.m., he and Officer Campbell arrived in separate patrol cars at the address provided by the dispatcher [Tr. at 43, 49]. Officer Stonerock said they were dispatched to the residence to confirm that a car previously reported stolen had been recovered and was at the residence [Tr. at 44]. Officer Stonerock stated that the car reportedly recovered was not at the residence when they arrived [Tr. at 44]. He said that while he went around the side of the house, Officer Campbell knocked on the door to speak with someone at the residence about the car [Tr. at 43, 45]. Officer Stonerock said Officer Campbell continued to knock on the door for a short time, attempting to get someone's attention [Tr. at 45].

8

Officer Stonerock said that within two-to-three minutes of the officers arriving at the residence, he saw a white Honda Accord and another vehicle traveling at a normal speed on the street toward the house [Tr. at 45-46, 50]. Officer Stonerock agreed that the Accord matched the description of the car the officers came to the house to see [Tr. at 46]. He said that suddenly, almost after the cars had passed the intersection, they braked quickly and made a wide left turn onto Deer Lake Drive [Tr. at 46]. Officer Stonerock said the wide turn caught his attention, because it seemed that the cars were avoiding coming to the residence [Tr. at 46]. He said he could not see the license plate of the Accord from where he was standing at the house [Tr. at 47].

Officer Stonerock agreed that he got in his patrol car and drove to find the white Honda [Tr. at 47]. He acknowledged that after turning onto the next block, he saw the Honda coming toward him on the opposite side of the road [Tr. at 47]. He could not see into the Honda, nor could he see the license plate [Tr. at 48]. Officer Stonerock agreed that he activated his blue lights to get the Honda to stop [Tr. at 48]. He said he stopped the Honda, because it was not at the address from the dispatch and he believed it was possibly the stolen car [Tr. at 49]. He agreed that he did not see the Honda commit any moving violations and that it was not speeding [Tr. at 50]. He also did not see any other vehicles commit moving violations or speed during the incident [Tr. at 51].

Officer Stonerock said that he got out of his patrol car and approached the driver of the Honda [Tr. at 50]. He said a silver Cadillac was parked parallel to the right curb, two or three car lengths from where he stopped the Honda [Tr. at 51]. He agreed that the Cadillac was legally parked and that its engine was not running [Tr. at 51]. He said that Officer Campbell confirmed that no one was inside the Cadillac [Tr. at 52]. Officer Stonerock denied that he stopped the Honda "on a hunch," and explained that he was investigating a report of a stolen car that was not at the residence where it was reported to be, when he saw a Honda traveling toward the house [Tr. at 52-

9

53]. He said the Honda maneuvered in an evasive manner, which caused him to suspect it was the stolen car [Tr. at 53]. He agreed that this is why he stopped the Honda [Tr. at 53].

Officer Stonerock testified that he spoke to the driver, who was being evasive [Tr. at 53]. He said that at that point, he was interested in both the Honda and the Cadillac [Tr. at 53]. He stated that he had checked the license tag of the Cadillac as he pulled up to the Honda and that the Cadillac was registered to Ricky Davis [Tr. at 53-54]. Officer Stonerock said he also knew no one was in the Cadillac, and he wondered where the driver was, because no one was in the yards near the Cadillac [Tr. at 53]. He said he also knew from prior experience, that an individual named Ricky Davis was connected to the address he had just left [Tr. at 54]. Upon speaking to the driver of the Honda, Officer Stonerock learned the driver was Ricky Davis [Tr. at 54].[4] Officer Stonerock said that as he put this information together, he became suspicious [Tr. at 54]. He agreed that Ricky Davis, the owner of the Honda, had reported that it had been recovered but said that encountering Davis with the Honda did not end the matter [Tr. at 55]. Officer Stonerock said he was still investigating a stolen vehicle at this point [Tr. at 55-56]. He said once he learned that the Defendant was the driver of the Honda, he wondered why the Defendant did not drive to his residence, rather than turning off on a side street in an evasive manner [Tr. at 56].

---

[4] When questioned about his reason for "blue-light[ing]" the Cadillac, Officer Stonerock testified, in part: "We knew that Ricky Davis, by the name, was the one that was at that house that owned a Cadillac from prior experience. We knew the name Ricky Davis" [Tr. at 54]. Based upon the context of the testimony at this point in the hearing, the Court questions whether Officer Stonerock intended to say that he knew from prior experience that Davis owned a "Cadillac." Instead, based upon Officer Stonerock's reference to the failed traffic stop two weeks earlier, the Court finds Officer Stonerock likely intended to say that he knew Davis owned a Honda Accord. In any event, the Court finds this is the only testimony that the officers knew Davis owned a Cadillac from their *prior experience* with Davis. In contrast, Officer Stonerock testified multiple times that he knew that Ricky Davis owned the Cadillac because he conducted a records check on the Cadillac's license tag just before he was stopped the Honda on Deer Lake Drive.

Officer Stonerock agreed that the Defendant was detained from the point he activated his blue lights and stopped the Honda [Tr. at 56]. Officer Stonerock stated that although he confirmed that Ricky Davis had no outstanding warrants, he still checked with the dispatcher regarding the Defendant's driver's license, because the Defendant had no identification [Tr. at 56-57]. He said he did not run the Honda's licence tag number right away, because he was parked next to it with the rear of the Honda turned away from him [Tr. at 57]. Officer Stonerock asserted that the dispatcher notified him that the Defendant's driver's license was revoked [Tr. at 57]. He said at that point, he handcuffed the Defendant and placed him in the back of his patrol car [Tr. at 57-58]. He stated that the Defendant was under arrest for driving on a revoked driver's license [Tr. at 57-58]. Officer Stonerock said that even though the Defendant was arrested and he had confirmed that the stolen vehicle was recovered, he was still investigating how the Honda was stolen and how the Defendant recovered it [Tr. at 58-59]. He also stated that the totality of the circumstances, including the Defendant's responses to his questions about the Cadillac, caused him to believe that something more was going on [Tr. at 60-61].

Officer Stonerock testified that after placing the Defendant in his patrol car, he called for a canine unit [Tr. at 63]. He agreed that Deputy Graves arrived on the scene at 1:37 a.m. [Tr. at 63]. Officer Stonerock said that Deputy Graves first walked the drug dog around the Honda [Tr. at 64]. He said the passenger was no longer in the Honda at this time [Tr. at 65]. He stated that Deputy Graves told one of the officers on the scene that the dog alerted on the Honda, and the officers searched the Honda [Tr. at 65-66]. He said the officers found the keys to the Cadillac in the Honda, but he did not recall whether they found a small amount of marijuana in the Honda [Tr. at 66].

Officer Stonerock said that when he activated his blue lights, he intended to stop both the Honda and the Cadillac [Tr. at 67-68]. He said he was suspicious about both vehicles, and he asked the canine officer walk around both vehicles [Tr. at 68]. Officer Stonerock agreed that Officer Campbell looked into the Cadillac through the windows with the aid of his flashlight, but he did not recall Officer Campbell reporting that it contained evidence of a crime [Tr. at 68]. Officer Stonerock said Deputy Graves walked the drug dog around the Cadillac and told the officers that it alerted on the passenger's side door, which was the side turned away from Officer Stonerock's in-car camera [Tr. at 69]. He agreed that Deputy Graves also told them that the dog alerted on the passenger's side of the Honda, which was also turned away from Officer Stonerock's in-car camera [Tr. at 69]. After the alert, the officers searched the Cadillac and found a Crown Royal bag containing drugs in the center console [Tr. at 70]. At the time the drugs were found, the passenger of the Honda was detained [Tr. at 70]. Officer Stonerock could not recall at what point the passenger was interviewed, but he said it was after Davis was arrested [Tr. at 71].

On redirect examination, Officer Stonerock testified that while standing by the Defendant's house, he saw the Cadillac driving in front of the Honda [Tr. at 72]. He confirmed that before he called the canine officer to the scene, he had arrested the Defendant for driving on a revoked license [Tr. at 72]. Officer Stonerock stated that to date, he does not know who stole the Honda or how the Defendant recovered it [Tr. at 72]. He said that after the Defendant was arrested, he was advised of the *Miranda* warnings and declined to answer questions [Tr. at 73]. He stated that he was not aware of anyone being caught and charged with stealing the Honda [Tr. at 73]. After watching the video recording again, Officer Stonerock testified that the dog sniff was conducted first on the Cadillac and second on the Honda [Tr. at 74]. He said that although he reversed this order on cross-examination, he knew the dog was walked around the Cadillac first, because he had

12

to move his patrol car after the dog sniff on the Cadillac but before Deputy Graves walked the drug dog around the Honda [Tr. at 74]. Officer Stonerock confirmed that the Honda was searched first [Tr. at 74]. He said the Cadillac was legally parked on the side of the street and that the officers were also legally at the sight of the search [Tr. at 75].

The Government also called Deputy Geritt Graves, who testified that he works on a Patrol Canine Unit with the Knox County Sheriff's Office ("KCSO") [Tr. at 76]. Deputy Graves stated that he has been a canine officer for a little more than one year and is assigned a German Shepherd named Rudi [Tr. at 76, 78]. He and Rudi are certified by National Narcotic Detector Dog Association ("NNDDA"), a nationally-recognized certifying organization for police dogs [Tr. at 77-78, 89; Exh. 6].

Deputy Graves described his and Rudi's training as follows: He and Rudi attended eight weeks of training at the KCSO, beginning on September 12, 2017, and an official from the certifying organization audited the training on five days [Tr. at 77-80, 89]. Dogs are trained to desire a length of rubber hose, which is the toy that the dog plays with at work, and the hose ultimately becomes a reward for the dog after he works [Tr. at 82]. Rudi was also trained with boxes containing the scents of controlled substances, and he alerted on boxes containing those scents and not on empty boxes [Tr. at 83, Exh. 5]. Rudi was scent-trained on methamphetamine on at least twenty-three days, including locating methamphetamine in a vehicle on nine days [Tr. at 84-87, Exh. 5]. Deputy Graves said that on every day of training, Rudi alerted only on drugs and never on a blank or an empty box [Tr. at 84]. Some boxes contain odors of items that people use to attempt to conceal narcotics, such as detergent, paper bags, grease, and currency, but the dogs are trained to alert only on controlled substances and not those items [Tr. at 85]. In addition

to being trained in substance detection, Deputy Graves and Rudi were also trained and certified in tracking and apprehension [Tr. at 87-88].

Deputy Graves said that Rudi is certified to detect marijuana, cocaine, heroin, methamphetamine, and Ecstasy [Tr. at 88, Exh. 6]. He confirmed that at the time of the stop on February 19, 2018, he and Rudi were trained and certified, and that Rudi had been deployed sixty to seventy times, approximately fifty of which were on vehicles, by that date [Tr. at 90]. Deputy Graves stated that Rudi had never alerted incorrectly by February 2018 [Tr. at 90-91]. He said that when a dog alerts on a vehicle and narcotics are not found, the occupants of the vehicle almost always admit that narcotics have been in the car or could have been in the car at an earlier time [Tr. at 91].

Deputy Graves stated that when Rudi is deployed on a car, Rudi's job is to sniff all areas of opportunity on the vehicle and his job is to make sure Rudi sniffs the vehicle [Tr. at 91]. He said "areas of opportunity" are the locations on the car at which an odor will most likely excape, such as the door seams, underneath the vehicle, open windows, open doors, wheel wells, the engine compartment, the grill, and the seam of the trunk [Tr. at 92]. Deputy Graves said that he walks Rudi around the vehicle on a leash, pointing high and low to direct Rudi to sniff high and low [Tr. at 92]. He said that if he thinks Rudi has "blow[n] by something," he will bring Rudi back to that location and present it again for Rudi to sniff [Tr. at 92].

Deputy Graves testified that he was called to assist on a KPD stop on "Deer Ridge Lane" on February 19, 2018 [Tr. at 93]. Deputy Graves identified the Defendant as Ricky Davis and recognized him from the stop on February 19, 2018 [Tr. at 77]. Upon arrival, Deputy Graves spoke with officers on the scene and agreed to deploy Rudi [Tr. at 93]. He first deployed Rudi on

a Cadillac [Tr. at 93]. He said he did not recall that any windows were open on the Cadillac [Tr. at 94]. Deputy Graves stated that Rudi alerted on the passenger side of the Cadillac by going to the greatest source of a trained odor and not leaving that spot [Tr. at 94]. He said that he continued to move around the vehicle, but Rudi stayed on that spot, so he rewarded Rudi for finding the odor by giving Rudi an unscented rubber hose length [Tr. at 94-95]. Deputy Graves said he and Rudi remained on the passenger's side of the Cadillac most of the time during the sniff, because he was confirming that Rudi was actually alerting [Tr. at 97]. Deputy Graves said that Rudi receives a reward whether he alerts or not at a deployment or in training [Tr. at 95]. Deputy Graves stated that Rudi will not alert just to get his toy [Tr. at 96].

Deputy Graves said after the deployment on the Cadillac was completed, Officer Stonerock asked whether the dog had alerted, and he replied that Rudi had alerted on the passenger's side [Tr. at 96]. He told Officer Stonerock that the substance could be anywhere in the vehicle [Tr. at 96]. Deputy Graves said that although he was wearing a body camera on February 19, 2018, he could not locate a video recording from that date [Tr. at 98]. He said that after a report or an arrest, he logs the video recording from his body camera and the location of the action [Tr. at 98]. He stated that he always wears his body camera and cannot explain the absence of a recording from February 19, 2018 [Tr. at 99].

Deputy Graves stated that after the dog sniff of the Cadillac, he deployed Rudi on the Honda [Tr. at 100]. He said he did not walk Rudi around the front or driver's side of the Honda, because Rudi alerted on the passenger's side [Tr. at 101-02]. Deputy Graves said that he told the officers that Rudi alerted on the passenger's side of the Honda, and it was searched [Tr. at 102]. He said the officers found a tiny marijuana joint in the center console [Tr. at 102].

On cross-examination, Deputy Graves testified that the KCSO purchased Rudi from a vendor of dogs in Miami and that Rudi is five and one-half years old. To Deputy Graves's knowledge, the scent training on narcotics that Rudi had at the KCSO is the only narcotics training Rudi has had [Tr. at 104]. He said Rudi has not been sent out of the area for additional training [Tr. at 111]. After the eight weeks of training, he began deploying Rudi around mid-November 2017 [Tr. at 103]. He agreed that he filled out the handler's notes on Rudi's training records and that those notes state that Rudi is 100% accurate from the first day he was trained [Tr. at 104-05]. He denied hearing his supervisor state that the quality of a drug detection dog is only as good as the dog's records [Tr. at 106]. Deputy Graves agreed that he had not seen or testified about Rudi's usage records, only his training records [Tr. at 106]. He said that Rudi was trained with actual drugs, such as cocaine and methamphetamine [Tr. at 107]. He agreed that he was constantly training Rudi [Tr. at 107].

Deputy Graves said that Rudi alerts by going to the greatest source of a trained odor and not leaving that spot [Tr. at 107]. He said that Rudi may sit or remain standing to alert, depending on where the greatest odor is located [Tr. at 108]. Deputy Graves said that he will continue his pattern of walking and pointing to confirm that Rudi is alerting and that the alert is confirmed, if Rudi does not follow him [Tr. at 108]. He agreed that he had reviewed the other officers' in-car camera video recordings of the dog sniff of the Honda and the Cadillac and that Rudi's alert is not captured on video for either vehicle [Tr. at 109]. Deputy Graves agreed that his body camera would have captured and been the best evidence of the alerts [Tr. at 109]. He said that when he requested the recordings from his body camera for this date, he received a reply that he could not get it [Tr. at 109].

Deputy Graves acknowledged that Rudi is 100% accurate, because he alerts either on the actual presence of drugs or on the residual odor of drugs [Tr. at 110]. He agreed that Rudi cannot indicate to his handler whether he is scenting actual drugs or a residual odor [Tr. at 110]. He agreed that on February 19, 2018, Rudi had been operational in the field about two and one-half months [Tr. at 110-11]. Deputy Graves said he has been a KCSO deputy for three years [Tr. at 111]. He agreed that on February 19, 2018, he had no independent suspicion at the scene and only knew what Officers Stonerock and Campbell told him [Tr. at 111].

## III.    FINDINGS OF FACT

Based upon the testimony of the witnesses and the exhibits in this case, the Court makes the following factual findings:

In early February 2018, KPD Officer T. Campbell attempted to stop a white Honda Accord for a traffic violation but the vehicle fled. Officer Campbell radioed a description of the car and its license tag number to all units. KPD Officer Alan Stonerock, who was on patrol that evening, heard this radio call and performed a records check on the license tag number. Officer Stonerock learned that the white Honda Accord was registered to Ricky Davis at 4108 Deer Creek Drive. Officer Stonerock droved to 4108 Deer Creek Road to attempt to intercept the Honda Accord but did not see the Accord that evening.

Approximately two weeks later, on February 19, 2018, Officers Stonerock and Campbell were again on patrol. They received a radio call from the KPD dispatcher that the owner of a stolen white Honda Accord had called to report that he had recovered the car and that it was now located at his house at 4108 Deer Creek Road. Officers Stonerock and Campbell both drove to

17

4108 Deer Creek Road to investigate the return of the stolen Accord, arriving at 12:55 a.m. The officers parked their patrol cars on the street. Although several vehicles were parked in the driveway at 4108 Deer Creek Drive, a white Honda Accord was not among them. Officer Stonerock recognized this address as the one associated with the failed traffic stop two weeks earlier and discussed this with Officer Campbell. Officer Campbell knocked on the door of the house, while Officer Stonerock stood at the side of the house near the driveway to provide security for Officer Campbell. Officer Campbell knocked for two to three minutes, but no one opened the door.

While standing by the driveway, Officer Stonerock saw a silver Cadillac, followed by a white Honda Accord, driving on Deer Creek Drive toward the residence. When the Cadillac had almost passed the intersection of Deer Lake Drive, it made an abrupt, wide turn onto Deer Lake Drive, and the Accord followed it. Officer Stonerock called to Officer Campbell, "there goes the white Honda," and ran to his patrol car. Officer Stonerock drove to catch up to the vehicles, which he could no longer see, and turned onto Deer Lake Drive. There, he saw the Cadillac parked on the side of the street and the Accord continuing away from him on Deer Lake Drive. Officer Stonerock checked the Cadillac's license tag number on his in-car computer and learned it was registered to Ricky Davis. The Accord drove a short distance beyond the Cadillac on Deer Lake Drive, turned around in a driveway, and drove toward Officer Stonerock. Officer Stonerock activated his blue lights and stopped the Accord as it was passing him on Deer Lake Drive.

Officer Stonerock got out of his patrol car and walked up to the driver of the Accord. The driver said he was on his way to his mother's house. Officer Stonerock asked the driver to whom the Cadillac belonged, and the driver replied that it probably belonged to the people in the nearby area and that he had been trying to buy the Cadillac. Officer Stonerock directed the driver to turn

the Accord off and to give him the keys. The driver could not produce any identification but identified himself as Ricky and said that he was the one who had reported the Accord as stolen. Officer Stonerock told the driver that this Cadillac was registered to him, to which the driver responded that he was trying to rent the Cadillac and that he had not paid for it yet. As he spoke with the driver, Officer Stonerock repeatedly directed him to keep his hands in view on the top of the steering wheel. While Officer Stonerock was talking with the driver, Officer Campbell arrived on the scene behind Officer Stonerock and walked up to the Cadillac. The Cadillac was unoccupied, but it was still warm from being recently driven.

Officer Stonerock learned from a records check that Ricky Davis had no outstanding warrants, but he asked the dispatcher to check Davis's driver's license, because Davis could not produce identification. The dispatcher reported that Davis's driver's license was revoked. Officer Stonerock then directed Davis to get out of the Accord with his hands raised. Once Davis was out of the car, Officer Stonerock arrested Davis for driving on a revoked driver's license, placed him in handcuffs, and seated Davis in his patrol car. Officer Stonerock then called for a canine unit

KCSO Deputy Gerrit Graves and his drug detection dog Rudi arrived on the scene around 1:37 a.m. Deputy Graves and Rudi are certified by the National Narcotics Detector Dog Association, and Rudi is trained to detect the odor of methamphetamine and other narcotics. After speaking briefly with Officer Stonerock, Deputy Graves led Rudi around the Cadillac. Rudi alerted on the passenger's side of the Cadillac. Deputy Graves told Officer Stonerock that Rudi had alerted on the passenger's side of the Cadillac but that drugs could be anywhere inside the car. Officer Stonerock moved his patrol car away from the Accord, from which the passenger Ronnie Johnson had also been removed. Deputy Graves led Rudi around the Accord, and Rudi alerted on the passenger's side of the Accord. Deputy Graves told one of the officers on the scene that Rudi

19

had alerted on the passenger's side of the Accord. The officers searched the Accord and found a set of keys to the Cadillac between the driver's seat and the center console. They also found a small marijuana joint in the center console. Officer Stonerock pressed the key fob on the keys found in the Accord and unlocked the Cadillac. The officers then searched the Cadillac and found a Crown Royal bag containing methamphetamine and other controlled substances in the center console.

At some point during the investigation on the scene, Officer Stonerock, or another officer, interviewed Ronnie Johnson, about the Accord. Johnson told law enforcement that he had picked up the Accord earlier that day in a parking lot near a bowling alley. Johnson said he drove the Accord to Deer Lake Drive and stopped behind the Cadillac, which was driven by Davis. Johnson stated that he then moved to the passenger's seat of the Accord. Johnson said that Davis got into the driver's seat of the Accord, just before Officer Stonerock pulled up behind them.

## IV.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant Davis argues that his Fourth Amendment rights were violated because (1) the officers lacked probable cause or reasonable suspicion to stop him on February 19, 2018 and (2) the officers had no lawful basis to conduct warrantless searches of his vehicles. As a part of this second argument, he also contends that the evidence does not show that the drug dog involved in this case was reliable or that the dog alerted on either the Honda or the Cadillac. Finally, Defendant Davis argues that the cumulative constitutional violations by law enforcement

warrant the exclusion of the evidence seized in the searches of his vehicles. The Court examines each of these issues in turn.

### A. Seizure and Detention of Defendant

The stop of a vehicle and detention of its occupants is a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Warrantless seizures are "'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens: (1) consensual encounters, which may be initiated by a police officer based on a mere hunch or without any articulable reason whatsoever; (2) investigative stops (or *Terry* stops), which are temporary, involuntary detentions and which must be predicated upon "reasonable suspicion;" and (3) arrests, which must be based upon 'probable cause.'" *United States v. Dickens*, 748 F. App'x 31, 35-36 (6th Cir. 2018).

In the instant case, both parties agree [Doc. 37, p. 7-8; Doc. 38, p.6] that Defendant Davis was seized when Officer Stonerock activated the blue lights on his patrol car, to stop the white Honda Accord, driven by the Defendant. Both parties also agree that the officers had not observed the Accord (or the Cadillac) commit a traffic violation at this point [*id.*]. The Court finds that Officer Stonerock's stop of Defendant Davis was not a consensual encounter, nor did the officer have probable cause to arrest Davis when he first stopped the Accord.[5] Thus, the Court must

---

[5] Although it acknowledges that no moving violations occurred, the Government argues that Officer Stonerock had probable cause to conduct *a traffic stop* of the Accord, because a white Honda Accord registered to Ricky Davis at 4108 Deer Creek Drive had been reported stolen and

determine whether Officer Stonerock's seizure of Davis falls within the second type of permissible warrantless encounter, i.e., whether Officer Stonerock had reasonable suspicion to stop the Accord at the time he activated his blue lights.

"[A] brief investigative stop, or *Terry* stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002) (quoting *United States v.* Sokolow, 490 U.S. 1, 12 (1989) & *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Assessing whether an investigatory stop comports with the Fourth Amendment is a two-step process: First, the Court must determine whether the officer had a reasonable basis for the stop by looking to whether the officer had reasonable suspicion supported by specific and articulable facts. *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). Second, if the stop was proper at its inception, the Court must examine whether the intrusiveness of the stop was reasonably related to the situation by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. *Id.*

A court reviewing the legality of an investigative stop must consider the totality of the circumstances in evaluating the presence of reasonable suspicion. *United States v. Arvizu*, 534

---

the driver of a white Honda Accord appeared to evade police upon seeing patrol cars at Davis's residence [Doc, 28, p.3; Doc. 38, p.3]. The Court finds that Officer Stonerock's stop of the Accord was an investigatory or *Terry* stop, rather than a traffic stop, which would require probable cause that a traffic or moving violation had occurred. Although, as discussed at length above, Davis's conduct was suspicious, the Court does not find that Officer Stonerock had probable cause that a crime had been committed, prior to learning that Davis's driver's license had been revoked. Moreover, despite framing the argument in terms of a traffic stop, the remainder of the Government's argument focuses on whether the officer had reasonable suspicion to conduct an investigatory stop of Davis. Thus, the Court need not engage in an in-depth analysis of whether Officer Stonerock had probable cause to stop and arrest Davis at the time he activated his blue lights. He did not.

U.S. 266, 273 (2002); *Martin*, 289 F.3d at 398. Although an officer may not rely upon a mere hunch to support a *Terry* stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274. Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. *Martin*, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest, then the officer must release the suspect. *Id.* at 397. With these principles in mind, the Court turns to the seizure in the instant case.

*(1) Reasonableness of Stop*

Looking at the totality of the circumstances surrounding the stop of the Accord, the Court finds that Officer Stonerock had reasonable suspicion that criminal activity was afoot. Officer Stonerock was dispatched to 4108 Deer Creek Drive to investigate the return of a white Honda Accord, which had previously been reported stolen. According to the dispatcher, the owner stated that he had recovered the Accord and that it was back at his residence on Deer Creek Drive. Officer Stonerock testified that it was odd for an owner to recover a stolen vehicle and return it to his home. Upon arriving at the address, Officer Stonerock recognized it was the home of Ricky Davis, to whom was registered a white Honda Accord that had fled a traffic stop two weeks earlier. Third, despite the officers arriving at the residence shortly after receiving the dispatch, they did not find a white Honda Accord parked amid the several vehicles in the driveway. This seemed suspicious to Officer Stonerock, and he and Officer Campbell continued their investigation into the reported recovery of the stolen Accord by attempting to talk with the residents.

23

While Officer Campbell was knocking on the front door of the residence and Officer Stonerock was standing at the side of the residence by the driveway,[6] Officer Stonerock saw a silver Cadillac and a white Honda Accord traveling on Deer Creek Road toward the residence. When the Cadillac was close enough to see the patrol cars parked on the street by 4108 Deer Creek Drive, it turned abruptly left onto Deer Lake Drive and the Accord followed. Officer Stonerock testified that he had the impression that the drivers of the vehicles wanted to avoid contact with law enforcement based upon the abrupt nature of the turn. He described the turn as wide and occurring when the Cadillac had nearly passed Deer Lake Drive. Officer Stonerock then drove immediately to catch up to the vehicles.

Defendant Davis argues that a white Honda Accord is a common color and model of car and that Officer Stonerock did not positively identify the Accord he observed turn onto Deer Lake Road as the reportedly stolen vehicle. However, the Court finds that given the time and location where Officer Stonerock spotted the Accord—at 1 a.m. within a block of the residence to which Ricky Davis's white Honda Accord was registered—Officer Stonerock reasonably suspected that the Accord that turned onto Deer Lake Road was the Accord, which was the subject of the stolen vehicle report. Before stopping the Accord, Officer Stonerock learned one additional fact: That the silver Cadillac that had been traveling in front of and apparently in caravan with the Accord was also registered to Ricky Davis. The Court finds that the stop of the Accord was not based upon a mere hunch, but, instead, upon specific and articulable facts, which gave Officer Stonerock

---

[6] Officer Stonerock testified that he took up this position on the side of the house by the driveway for reason of officer safety, in order to secure himself and Officer Campbell from a surprise approach from behind the house. In this regard, the Court notes that that the officers arrived at the house at 12:55 a.m., shortly after the dispatch, expecting to find the Honda Accord at the residence. Officer Stonerock's defensive posture corroborates his testimony that he found the citizen report described by the dispatcher and the absence of the Honda at the residence to be suspicious.

24

reasonable suspicion that the Accord was the stolen vehicle that he was investigating. Thus, the Court finds that Officer Stonerock properly stopped the Accord.

*(2) Reasonableness of Scope of Stop*

Finding that the stop of the Accord was proper at its inception, the Court next turns to whether the scope of the stop (its duration and intrusiveness) was reasonable in light of the circumstances. An officer with reasonable suspicion to stop and detain an individual may ask a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. *Martin*, 289 F.3d at 396. The duration of the stop is measured in light of whether the officer "diligently pursued a means of investigation that was likely to confirm or dispel [his or her] suspicions quickly[.]" *United States v. Sharpe*, 470 U.S. 675, 687 (1985) (assessing the reasonableness of a *Terry* stop).

After stopping the Accord, Officer Stonerock asked the driver questions about his identity, his ownership of the Accord, and about the Cadillac parked nearby. The driver agreed that he was "Ricky" and that he had reported the Accord as stolen but disavowed connection to the Cadillac, stating that it likely had been driven by someone else in the neighborhood ("those guys over there") and that he had been trying to buy it. Officer Stonerock, who at this point knew the Cadillac was registered to Ricky Davis and had identified the driver of the Accord as Davis, thought Davis's disavowal of the Cadillac was odd and evasive. Officer Stonerock confronted Davis with the fact that the Cadillac was registered to him, but Davis continued to distance himself from the Cadillac, saying that he was renting it and that he had not paid for it yet. Officer Stonerock testified that in light of the fact that the Davis had no outstanding warrants and was not attempting to hide his identity, Officer Stonerock believed, based upon his experience as a police officer, that the

Defendant was being evasive about the Cadillac, because it contained drugs [Tr. at 26-28]. Officer Stonerock then learned from the dispatcher that Davis's driver's license was revoked. At this point, Officer Stonerock asked Davis to step out of the car and arrested him for driving on a revoked license.

The video recording from Officer Stonerock's in-car camera revealed that the time from the stop of the Accord to the Defendant's arrest took approximately four minutes and ten seconds [Exh. 1, Stonerock clip 1]. During this time, Officer Stonerock questioned the Defendant in an attempt to identify him and his connection to the two vehicles, which Officer Stonerock had seen traveling together and one of which matched the description of a vehicle that had been reported as stolen. Rather than dispelling the officer's suspicions, the Defendant's responses to questions caused Officer Stonerock to suspect the Defendant was hiding something in relation to the Cadillac. Based upon his previous experience as a law enforcement officer, Officer Stonerock suspected the Defendant might be hiding drugs in the Cadillac. The totality of the circumstances test "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arivizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). The Court finds the scope of the stop of the Defendant was reasonable in both length and degree of intrusiveness.[7]

*(3) Check of the Cadillac*

---

[7] Defendant Davis argues that the Officers had no reason to continue to detain the Accord further or to search it, after the Defendant's arrest. The search of the Accord is analyzed in part (B).

Defendant Davis also argues that the officers had no reasonable suspicion to seize the Cadillac, which had not violated any traffic laws and was not mentioned in the dispatch on the recovered Accord. The Court finds that the Cadillac was not seized at the time that Officer Stonerock stopped the Defendant. Officer Stonerock testified that at the time he activated his blue lights, he intended to stop both the Accord and the Cadillac, which was parked on the street. Although he knew the Cadillac was parked, Officer Stonerock stated that he did not realize it was empty of occupants until Officer Campbell walked up and looked inside, while he was talking with Davis. The Court finds that Officer Stonerock did not "stop" the Cadillac, which was already parked when he drove up behind it. The Court also finds that Officer Stonerock did not seize anyone inside the Cadillac, when he activated his blue lights, because it was empty.[8]

The Court also finds that Officer Campbell's brief look into the Cadillac, to determine whether it was occupied, was not a seizure under the Fourth Amendment. The officers were interested in the Cadillac, because they believed it to be connected to the Accord that had been reported stolen. They also believed it might be occupied, because Officer Stonerock had observed it turn onto Deer Lake Drive only moments before he stopped the Accord. The Court finds Officer Campbell's external examination of the Cadillac to determine whether it was occupied did not implicate the Fourth Amendment. *See generally California v. Ciraolo*, 476 U.S. 207, 213 (1986) (observing that the Fourth Amendment does not require officers "to shield their eyes" from a view

---

[8] Officer Stonerock would later learn from Ronnie Johnson, the passenger in the Accord, that the Defendant had been driving the Cadillac immediately before Officer Stonerock pulled up but had parked it and entered the Accord. However, the Defendant was not in the Cadillac when Officer Stonerock seized him, nor did Officer Stonerock know that Davis had been driving the Cadillac, during the stop of the Accord.

open to the public).  The Court examines the propriety of the subsequent search of the Cadillac in the next section.

## B.  Warrantless Search of the Vehicles

The Defendant argues that the February 19, 2018 warrantless searches of his Accord[9] and his Cadillac violate the Fourth Amendment.  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions."  *Katz v. U.S.*, 389 U.S. 347, 357 (1967) (footnotes omitted).  The Government argues the officers lawfully searched the vehicles pursuant to the automobile exception to the Fourth Amendment warrant requirement.

The mobility of an automobile as well as the reduced expectation of privacy stemming from the fact that automobiles are highly regulated gives rise to the automobile exception. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).  "If there is probable cause to believe that a vehicle contains evidence of criminal activity," an officer may search "any area of the vehicle in which the evidence might be found."  *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (setting out the automobile exception and citing *United States v. Ross*, 456 U.S. 798, 820-21 (1982)); *United States v. Mans*, 999 F.2d 966, 969 (6th Cir.) (when "police have probable cause to believe that a vehicle contains contraband, they may search the entire vehicle and any contents located within it"), *cert. denied*, 510 U.S. 999 (1993).  As long as the vehicle is mobile and law enforcement has probable

---

[9] The Defendant primarily takes issue with the search of his Cadillac.  However, in the body of his argument, he at times argues the search of both vehicles was unconstitutional.  For example, he argues that the drug detection dog did not validly alert on either vehicle.  Because the Defendant makes some arguments about the search of the Accord, the Court addresses the searches of both vehicles.

28

cause to believe that it contains evidence of the crime, no exigent circumstances need be present. *Labron*, 518 U.S. at 940; *see also Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999); *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002).

The Defendant argues the automobile exception does not apply in this case. First, he contends that the officers lacked probable cause to search either vehicle. His challenge to probable cause is three-fold: He asserts that the officers had no suspicion or reason to detain the vehicles in order to subject them to a dog sniff, that the drug detection dog was not reliable, and that the dog did not alert on either vehicle. The defendant also challenges the application of the automobile exception to the Cadillac, because he contends that it was not mobile at the time the officers searched it.

*(1) Basis for Dog Sniff*

Defendant Davis contends that the officers had no reasonable suspicion to justify subjecting his vehicles to a dog sniff. He maintains that before the canine unit was called to the scene, Officer Stonerock had stopped, detained, and then arrested him. He asserts that at the time of his arrest, Officer Stonerock knew that he was the owner of the Accord and that he was the one who had reported it stolen. The Defendant argues that with the investigation into the stolen Accord now completed, law enforcement was obliged to permit the passenger of the Accord to drive the Accord from the scene. With regard to the Cadillac, the Defendant argues that it was not a part of the dispatch that brought the officers to the neighborhood and it was legally parked on the side of the street. Thus, he contends that the officers had no suspicion of criminal activity whatsoever in relation to the Cadillac.

The Court begins by observing that in and of itself "a dog sniff does not constitute a search under the Fourth Amendment." *Hill v. Sharber*, 544 F. Supp. 2d 670, 679 (M.D. Tenn. 2008);

*United States v. Place*, 462 U.S. 696, 707 (1983) (holding that a dog sniff of private property located in a public place was not "a 'search' within the meaning of the Fourth Amendment). However, the context of the sniff is important. The canine unit must be "lawfully present at the location where the sniff occurs." *United States v. Reed*, 141 F.3d 644, 650 (6th Cir. 1998). For example, law enforcement may not bring a drug detection dog within the curtilage and up to the door of a person's home to determine whether drugs are inside, because the physical intrusion for the purposes of gathering information about the details of the home "is a 'search' within the meaning of the Fourth Amendment." *Florida v. Jardines*, 569 U.S. 1, 11-12 (2013). In contrast, law enforcement may sweep a public parking lot with a drug detection dog and with no additional suspicion as to any vehicle there, without violating the Fourth Amendment. *United States v. Diaz*, 25 F.3d 392, 396 (6th Cir. 1994) (affirming dog sniff of vehicle in motel parking lot); *Hill*, 544 F. Supp. 2d at 679 (analyzing suspicionless sweep of unfenced school parking lot with trained drug dog).

The Court finds that a dog sniff of the Defendant's Cadillac parked on the side of a street is similar to a dog sniff of a vehicle in a public parking lot. The officers did not have to have any particular suspicion with regard to the Cadillac in order to conduct the dog sniff, because the canine unit was legally present. In discussing the analysis and scope of the majority opinion in *Jardines*, the dissent observed that the majority opinion was limited to a "'physical intrusion of a constitutionally protected area'" and "[a]s a result does not apply when a dog alerts while on a public sidewalk or street[.]" 569 U.S. at 25-26 (Alito, J., dissenting). In his motion, the Defendant points the Court to *State v. Leak*, in which the Ohio Supreme Court held that the warrantless search of a legally parked vehicle, after the arrest of the owner, was unconstitutional. 47 N.E.3d 821, 831 (Ohio 2016). However, in *Leak*, the state sought to justify the search as incident to the owner's

arrest or as an inventory search, not under the automobile exception. *Id.* at 827-30. Also, importantly, the officers in *Leak*, did not have probable cause, from a dog alert or otherwise, to believe the car contained contraband. *See id.* at 827. Thus, *Leak* is not persuasive on the instant issue. Accordingly, the Court finds that the dog sniff of the Cadillac parked on a public street was permissible without the need for law enforcement to suspect that the Cadillac contained drugs.

The Court also finds that the dog sniff of the Accord did not violate the Fourth Amendment. Law enforcement may bring a canine unit to the scene of an investigatory stop with no particular suspicion of drugs as long as the dog sniff does not prolong the investigatory stop beyond its purpose. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015) (analyzing traffic stop but comparing it to an investigatory or *Terry* stop); *Illinois v. Caballes*; 543 U.S. 405, 409 (2005). The Government argues that after the Defendant was arrested, the analysis of whether the investigatory stop was unjustifiably prolonged ends: "Davis was heading to jail, not home, and the Honda was in the lawful possession of the Knoxville Police Department" [Doc. 38, p.6]. The Defendant disagrees, saying the investigatory stop was at an end (the stolen vehicle was found) and the officers should have released the Accord to the passenger.

The Court finds there was no evidence presented with regard to whether the KPD impounded the Accord or released it to the passenger or a designee of Davis. However, regardless of either outcome, the Court finds that the investigation into the stolen Accord was not concluded at the time the Defendant was arrested and Officer Stonerock called for the canine unit. Officer Stonerock testified that at some point after the Defendant's arrest, he (or one of the officers on the scene) interviewed the passenger Ronnie Johnson about how he came to be in the Accord that evening. Thus, the investigation into the theft of the Accord was ongoing after the Defendant's arrest. Officer Stonerock said the canine unit arrived not long after he called for it, "[w]ell under

an hour, but a matter of minutes, if I had to say" [Tr. at 63]. He agreed on cross-examination, that it was likely at 1:37 a.m., if that was the time of arrival that Deputy Graves wrote on his report.[10] Based upon Officer Stonerock's testimony and the video recording of the stop [Exh.1, Stonerock clip 1], the Court finds that approximately ten minutes elapsed from the officer's arrival at the Defendant's residence at 12:55 a.m. and the arrest of the Defendant. Accordingly, it may have taken up to thirty-two minutes for Deputy Graves to arrive, after Officer Stonerock called for a canine unit. However, the Court finds that during this time, the officers were continuing to investigate the stolen Accord.

*(2) Probable Cause*

An alert by a properly trained and certified drug detection dog provides probable cause to believe that a vehicle contains controlled substances. *See Florida v. Harris*, 568 U.S. 237, 245 (2013); *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012). Here, Deputy Graves testified that his drug detection dog Rudi alerted on both the Cadillac and the Accord. These alerts would provide probable cause for the officers to search the two vehicles, pursuant to the automobile exception. The Defendant challenges the alerts, arguing that Rudi was not a reliable drug detection dog and that he did not alert on the vehicles.

"If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Harris*, 568 U.S. at 246-47. A defendant may challenge a drug dog's reliability by cross-examining the dog's handler or by presenting a fact or expert

---

[10] Deputy Graves's report was not introduced into evidence.

witness. *Id.* at 247. Additionally, "even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the [handler and dog] team was working under unfamiliar conditions." *Id.* In short, the "sniff is up to snuff" if "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 248.

The Defendant argues that the drug detection dog in this case was not reliable. He contends that Rudi was trained in-house at the KCSO, rather than by a national organization. In addition to Rudi's questionable training, he contends the Government presented no usage records to demonstrate Rudi's reliability in the field. Additionally, he points out that Rudi was inexperienced and had only been working in the field for two and one-half months at the time of the dog sniffs of his vehicles. Thus, he argues that Rudi is not proven to be reliable.

The Court finds the Government demonstrated that Rudi is reliable. Deputy Graves testified that he and Rudi participated in eight weeks of training. Although the training occurred at the KCSO, an official from the National Narcotic Detector Dog Association audited the training for five days. Deputy Graves testified that Rudi never incorrectly alerted during training. He said that at the end of the eight weeks, Rudi was certified by the NNDDA to detect a number of narcotic drugs, including methamphetamine. The Defendant argues that the Government failed to provide evidence of Rudi's reliability in the field. However, Deputy Graves testified that prior to February 19, 2018, he deployed Rudi to sniff for controlled substances approximately sixty to seventy times, fifty of which were on vehicles. Deputy Graves testified that to his knowledge, Rudi never alerted incorrectly on any of these deployments. Thus, the Court finds the Government provided evidence

33

that Rudi was reliable in the field. Despite a thorough cross-examination of Deputy Graves, the Court finds no evidence to contradict a finding that Rudi is generally reliable.

The Defendant also argues that no adequate, objective basis exists to find that Rudi alerted on the vehicles. He contends that Deputy Graves gave a vague description of the manner of Rudi's alert, testifying that Rudi gives a passive alert by standing or sitting or "do[ing] different things" [Tr. at 108]. He maintains that Rudi's alerts were not captured on the video recordings from the patrol cars on the scene, because in both instances he allegedly alerted on the side of the vehicle that was not in view of the camera. Moreover, the Defendant asserts that the video recording of the dog sniffs from Officer Graves's body camera, which he characterizes as the best evidence of the alerts, was destroyed. Thus, he contends that the available evidence does not show the alleged alerts to be valid. The Court disagrees.

Officer Graves's testimony that Rudi alerted on both the Cadillac and the Accord was credible and unimpeached. Although he testified that Rudi could alert by either sitting or standing, depending on whether the source of the greatest trained odor was high or low, Officer Graves said that Rudi alerts by staying by the source of the greatest odor, even though Officer Graves continues to move around the vehicle. Officer Graves testified that Rudi alerted by staying by the source of the greatest odor with regard to both the Cadillac and the Accord. Officer Graves stated that he told the officers on the scene that Rudi had alerted on the two vehicles. Officer Stonerock corroborated this testimony, stating that Deputy Graves told him or another officer on the scene that the dog had alerted after the dog sniff of each vehicle. The fact that a video recording from Deputy Graves's body camera was not available does not discredit Deputy Graves's testimony that Rudi alerted on both vehicles.

34

In summary, the Court finds that the evidence presented at the hearing demonstrated that Rudi is reliable and that he alerted on the Cadillac and the Accord. The Court finds that Rudi's alerts on the two vehicles would provide a reasonable officer cause to believe that a search of the vehicles would reveal contraband. *Harris*, 568 U.S. at 248. In other words, the sniffs were "up to snuff" and provided probable cause for the officers to search the Cadillac and the Accord.

*(3) Mobility*

Defendant Davis also argues that the automobile exception does not apply to the Cadillac because it was not mobile at the time of the search. He contends that the Cadillac was parked on the side of the street, he was in police custody, and the officers had the keys to the Cadillac. Thus, he maintains there was no reason the officers could not have sought a search warrant for the Cadillac.

The mobility requirement of the automobile exception requires that the vehicle be "readily mobile by the turn of an ignition key, if not actually moving" and present "in a setting that objectively indicates that vehicle is being used for transportation." *California v. Carney*, 471 U.S. 386, 393 (1985). In the instant case, Officer Stonerock found the Cadillac parked on a public street just moments after he saw it being driven. The Cadillac was readily mobile and had been used for transportation only minutes before Officer Stonerock arrived on the scene. The fact that the officers had arrested the Defendant and seized a set of keys to the Cadillac did not render it immobile for purposes of the automobile exception. Our appellate court "has upheld warrantless automobile searches in which officers were in control of both the keys to the vehicle and the operator of the vehicle." *United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007). If the automobile exception properly applies, there is no requirement to obtain a search warrant, even if law enforcement has time to do so. *United States v. Hofstatter*, 8 F.3d 316, 322 (6th Cir. 1993),

35

*cert. denied* 510 U.S. 1131 (1994). The Court finds the Cadillac was mobile for purposes of the automobile exception.

In conclusion, the Court finds that the officers properly searched both the Accord and the Cadillac pursuant to the automobile exception to the Fourth Amendment's warrant requirement.

### C. Cumulative Constitutional Violation

Finally, in his post-hearing brief, the Defendant argues that the seizure of his person and the searches of his vehicles were cumulatively unconstitutional. He argues that at every stage of the investigation, there were grievous constitutional problems with the manner in which the police conducted this search and seizure. He highlights the fact that the video recording from Deputy Graves's body camera of the dog sniffs of both vehicles was not preserved.[11] The Defendant asserts that considered together, the errors in this case warrant exclusion of the evidence seized from the Cadillac.

The Court has examined the officers' conduct on the evening of February 19, 2018, and found that neither the stop of the Defendant, nor the search of the vehicles, violated the Fourth Amendment. Even if a Fourth Amendment violation occurs, exclusion of the evidence is not automatic. *United States v. Herring*, 555 U.S. 135, 141 (2009) (holding that the exclusionary rule

---

[11] The Defendant did not raise the missing video recording as a specific issue in his post-hearing brief, other than to argue its absence undercuts Deputy Graves's testimony that the dog alerted on each of the vehicles. To the extent that the Defendant implies that the absence of this evidence is a constitutional violation, the Court notes that neither bad faith on the part of law enforcement or the apparent exculpatory value of the video recording were shown at the evidentiary hearing. *See United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (holding that to show a due process violation with regard to potentially exculpatory evidence, a "defendant must show . . . the government acted in bad faith in failing to preserve the evidence," "the exculpatory value of the evidence was apparent before its destruction," and the defendant had no reasonable recourse to comparable evidence).

is a judicially created rule that is only applied when suppression would yield "appreciable deterrence" on the part of law enforcement). Certainly, if no Fourth Amendment violation is present, exclusion is not warranted.

## V.    CONCLUSION

After carefully considering the parties' filings and arguments, the evidence, and the relevant legal authorities, the Court finds no Fourth Amendment violation occurred in this case. Officer Stonerock had reasonable suspicion to stop the Honda Accord driven by the Defendant. Defendant Davis was properly arrested for driving on a revoked license. Finally, the officers had probable cause based upon the alerts of a reliable drug detection dog and properly searched both of the Defendant's vehicles pursuant to the automobile exception. Accordingly, the undersigned respectfully **RECOMMENDS** that the Defendant's Motion to Suppress Evidence [**Doc. 27**] be denied.[12]

Respectfully submitted,

_Bruce Guyton_

United States Magistrate Judge

---

[12] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); _see United States v. Branch_, 537 F.3d 582, 587 (6th. Cir. 2008); _see also Thomas v. Arn_, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide _de novo_ review where objections to this report and recommendation are frivolous, conclusive, or general. _Mira v. Marshall_, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. _Smith v. Detroit Federation of Teachers_, 829 F.2d 1370, 1373 (6th Cir. 1987).